Kelli J. Keegan
Tierra Marks
Admitted Western Dist. of Texas
Barnhouse Keegan Solimon & West LLP
7424 4th Street NW
Los Ranchos de Albuquerque, NM 87107
Phone: (505) 842-6123
Fax: (505) 842-6124
Email: kkeegan@indiancountrylaw.com
        tmarks@indiancountrylaw.com

Attorneys for Plaintiff Ysleta Del Sur Pueblo

## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| YSLETA DEL SUR PUEBLO, a federally recognized Indian tribe,<br><br>        Plaintiff,<br><br>   v.<br><br>CITY OF EL PASO, a Texas home-rule municipality,<br><br>        Defendant. | Case No.:  3:23-cv-00132<br><br><br>VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT CONFIRMING TITLE TO REAL PROPERTY AND INJUNCTIVE RELIEF AND DAMAGES<br><br>Honorable _____ |

Plaintiff Ysleta Del Sur Pueblo for its Complaint states:

### NATURE OF THE CASE

This is a federal common law action against the city of El Paso ("City") seeking a declaratory judgment that the Ysleta del Sur Pueblo ("YDSP" or "Pueblo") owns a beneficial possessory interest in aboriginal Indian title and Spanish land grant title to 111.73 acres of Indian trust land ("subject Property" or "Property") to which the City claims a competing title, injunctive relief against interference by the City with YDSP's occupation and quiet enjoyment of

the subject Property, and damages.  YDSP was settled in its present location between 1680 and

1682.  It subsequently established aboriginal Indian title in the area, and received a four-square

league communal, inalienable, Indian Pueblo Spanish land grant pursuant to Spanish colonial

law and policy as administered in New Mexico.  The subject Property lies within YDSP's

aboriginal Indian title area, and within YDSP's Spanish land grant area.  YDSP was designated a

"Pueblo de Indios" pursuant to Spanish colonial law and YDSP's ownership of the subject

Property has been at all times protected from conveyance, alienation and privatization by

Spanish colonial law, Mexican law, and United States law.  This complaint alleges federal

common law trespass to Indian tribal trust property, including YDSP's aboriginal Indian title and

Spanish land grant title; violation of the Indian Non-Intercourse Act, 25 U.S.C. §177; and

violation of 42 U.S.C. §1983 (Civil action for deprivation of rights).  Additionally, 25 U.S.C.

§194 (Trial of right of property; burden of proof) is applicable.

## PARTIES

1.      Plaintiff YDSP is a federally recognized sovereign Pueblo Indian tribe entitled to

all the privileges and immunities associated with that status.  YDSP is listed on the Federally

Recognized Indian Tribe List, 88 Fed. Reg. 2112, 2115 (Jan. 12, 2023).

2.      Defendant city of El Paso is a home-rule municipality with local governmental

authority within the state of Texas.

## JURISDICTION AND VENUE

3.      Federal question jurisdiction is invoked under federal common law, 28 U.S.C.

§1331 and 28 U.S.C. §1362 for violations of YDSP's federally protected possessory interests in

its aboriginal Indian title and Spanish land grant title, 25 U.S.C §177 (Purchases or grants of

lands from Indians), and 42 U.S.C. §1983 (Civil action for deprivation of rights).  The pendant

jurisdiction of the Court is also invoked with respect to any claims determined by the Court to be state law claims.

4.      Pursuant to 28 U.S.C. §1391(b)(1)-(2), venue is proper in the United States District Court for the Western District of Texas, El Paso Division, because the subject Property is situated within this district.

### FACTUAL AVERMENTS COMMON TO ALL CAUSES OF ACTION

**A.      The Ysleta del Sur Pueblo.**

5.      YDSP is an indigenous Native American tribe of Tigua Indians which was originally situated on the Rio Grande River at Isleta, a few miles south of present-day Albuquerque, New Mexico, from long prior to European contact.

6.      YDSP has continuously maintained itself from long prior to the 1680 Pueblo Revolt to the present as a self-governing tribal entity with a traditional New Mexico Indian Pueblo political and religious organizational structure, traditional cultural and ceremonial practices; and civil and military leadership consisting of a cacique (religious headman – the ultimate authority in traditional Pueblo Indian governments), a governor, a lieutenant governor, war captains, and various officers as typical Indian Pueblos have been organized since prior to the 1680 Pueblo Revolt.

7.      The YDSP Tribal Council is the duly constituted traditional governing body of the Pueblo and has continuously exercised all of YDSP's inherent governmental power and fiscal authority.

8.      The YDSP Governor and Lieutenant Governor provide administrative oversight of tribal government operations and serve on the YDSP Tribal Council.

B.     **The Historical Background.**

*The Spanish Colonial Period: 1598-1821.*

9.      In 1680, after decades of political subordination, economic exploitation, and religious persecution under Spanish rule, the various Pueblos of the northern Rio Grande Valley revolted and drove the Spanish from Northern New Mexico.  Spanish colonists, forced to retreat from the Spanish capital of colonial New Mexico at Santa Fe, fled south, finding refuge at Mission Nuestra Señora de Guadalupe del Paso de Rio del Norte, then a Spanish "pueblo" and now Ciudad Juárez, Mexico.  Mission Nuestra Señora de Guadalupe del Paso de Rio del Norte was later designated a "villa" as a result of the royal cédula of 1683 that instructed governor-elect Jironza Petriz de Cruzate to create a settlement for the Spanish inhabitants at El Paso.

10.      A contingent of Tigua (Tiwa-speaking) Indians from Isleta Pueblo, along with Piro Indians from the Pueblos of Sevilleta, Alamillo, Socorro, and Senecú, south of Albuquerque, were relocated by the Spaniards in their 1680 flight to Mission Nuestra Señora de Guadalupe del Paso de Rio del Norte.

11.      In 1681, colonial New Mexico Governor Antonio de Otermín attempted, and failed, to reconquer New Mexico.  Before returning to El Paso, he attacked Isleta Pueblo, reducing the entire remaining population to his control.  Another group of 385 Isleta Indians accompanied the Spanish expeditionary force as prisoners on its return to El Paso in 1682.  Governor Otermin relocated them to join the first contingent of Tiguas who left Isleta in 1680.  Reunited, these Tiguas represented a large portion, though not all, of YDSP's population.  The refugees from Isleta formed the nucleus of what would later be known as Ysleta del Sur Pueblo ("Isleta of the South," or "Southern Isleta").

12.     YDSP was established at its present location by the Tigua speaking Pueblo Indians who were relocated by the Spanish from Isleta Pueblo between 1680 and 1682.

13.     A "Pueblo de Indios" was a community of Indian colonial subjects who lived in a fixed village.  These communities existed throughout the Spanish empire in the New World and were important components of the colonial system.  In exchange for the political and economic support that the "Pueblos de Indios" provided, the crown conferred upon them certain rights, notably the right to self-government and the right to own communal lands.

14.     From its establishment, YDSP was designated a "Pueblo de Indios," an officially recognized Indian corporate entity under Spanish law and administration in colonial New Mexico.

15.     YDSP members have continuously used and occupied the Pueblo's aboriginal Indian title and Spanish grant lands, including the subject Property, exclusively as against all other Native American tribes, from their arrival in the El Paso area between 1680 and 1682 to the present, and long prior to the incorporation of Defendant city of El Paso in 1873.

16.     Following settlement, YDSP established a large aboriginal Indian title territory in the El Paso area to the north, east and southeast of El Paso for religious, hunting, gathering, and other resource utilization.

17.     Following settlement, YDSP immediately began diverting the waters of the Rio Grande for irrigation.  YDSP developed an extensive irrigation system for agricultural purposes in the area surrounding the Pueblo.  YDSP originated many of the canals and ditches still in use in El Paso County, Texas.

18.    The Spanish used the Tiguas of YDSP as laborers to construct La Mission de San Antonio de Ysleta del Sur Catholic Church, also known as mission Corpus Christi de la Ysleta de los Tiguas.  This mission is still used by YDSP today.

19.    On September 4, 1683, a royal cedula confirmed a 1682 decision of Viceregal authorities in Mexico City that the Spaniards and Indians in the El Paso area should live apart, with clearly delineated boundaries between the two.

20.    The 1683 royal cedula also appointed Domingo Jironza Petriz de Cruzate Governor of colonial New Mexico and instructed him to:

> [make] a settlement of all Spaniards who may be found in said location …, giving it the title of Villa, …; making congregaciones and settlements as may be necessary at the most favorable sites for the Indians who may have left [the upper Rio Grande] on one or another occasion, without prejudice toward the congregaciones of Sumas and Mansos that formerly existed at that site, designating to each pueblo the lands that may be needed, and the limits and boundaries; and [do so] also for the Villa that you might create for Spaniards, which must be separated so that in this way the Indians may be free and discord regarding the use of land and water and woodlands may be avoided, leaving the Indians in liberty, without being subject to involuntary servitude. . . .

21.    Prior to 1704, pursuant to Spanish law and policy as administered in colonial New Mexico, the Spanish Crown made a communal, inalienable Pueblo Indian land grant to YDSP.

22.    By 1704, Spanish colonial law and policy in New Mexico recognized a four square league Pueblo Indian land grant, or an equivalent acreage (17,350 acres more or less), to each Indian Pueblo ("Pueblo de Indios").  In some cases, these grants are not perfect squares.

23.    As exemplified in Book 6, Title 3, Law 8, of the Recopilación de Indias, and as found in many other cédulas, decrees, and policies, Spanish colonial law protected the lands and livelihood of indigenous communities in the Spanish colonies from trespass, alienation, and privatization.  Indigenous lands were to be respected and not encroached upon by Spaniards.

24.     A "Pueblo de Indios" had special protections prohibiting the conveyance, alienation, or privatization of tribal communal lands as a matter of law.

25.     Spanish maps from the 18th century identify YDSP as a "Pueblo de Indios," including the 1710-1724 Burrus / Kino map, the 1727 Álvarze Barreiro map, and the 1748 Fray Juan Miguel Menchero map.  The 1758 Bernardo Miera y Pacheco map shows the four Indian Pueblos downriver from El Paso; San Lorenzo, Senecú, Ysleta, and Socorro; roughly equidistant from one another and about two leagues apart.

26.     Don Diego de Vargas was the appointed Spanish Governor of colonial New Mexico from 1691 to 1697, and from 1703-1704.

27.     Governor Vargas recognized and reaffirmed the Indian Pueblo land rights in the El Paso area.  In 1692 he resolved a boundary dispute between the Pueblos of Socorro and Ysleta del Sur by establishing the boundary between the two Pueblos as a particular irrigation ditch.

28.     Prior to 1821 when the office was abolished, Spanish law provided for the appointment of a "Protector de Indios" (Protector of Indians) to advocate for indigenous communities, especially in land disputes.

29.     In 1749 Fray Andrés Varo recorded an Indian population of 500 and a Spanish population of 54 at YDSP, or approximately 90 percent Indian.

30.     In 1755 a Protector of Indians was appointed to protect YDSP in a land grant boundary dispute with a non-Indian neighbor.

31.     In 1802, to settle a land dispute between the Ortega family and the Socorro Indian Pueblo (adjacent to YDSP downriver), El Paso Lieutenant Governor Bernal established the boundary between the Ortegas' land and Socorro by measuring a full league to the south from the Pueblo church.  The Pueblo was not required to produce a grant document.  The 1802

document detailing this event shows that Socorro Pueblo's land was communal and corporate

and did not belong to individual residents within the grant. The boundary between the Ortegas'

land and Socorro Pueblo was measured again in 1808 with the same result.

32.    On April 18, 1815, New Mexico Spanish Governor Alberto Maynez issued a

decree stating that:

> the five thousand-vara league, measured from the cross in the cemetery in each
> direction, which his majesty made as a grant to every Indian Pueblo from the time
> of its founding, is to be maintained in order to support the natives of the pueblo,
> such that they [can] use it and cannot give or sell it without the king's permission
> because it is a patrimony or inherited estate. No judge or governor has the authority
> to sell all or part of the aforesaid league.

***The Mexican Period: 1821-1848.***

33.    Mexico achieved independence from Spain pursuant to the Treaty of Córdoba on

August 24, 1821.

34.    The state of Chihuahua, Mexico, was created on June 7, 1824, pursuant to the

1824 Mexican Constitution. Chihuahua (with jurisdiction over the El Paso district), enacted its

specific colonization law on May 26, 1825, "Ley de Colonización para el Estado libre de

Chihuahua" (Colonization Law for the Free State of Chihuahua), which made vacant lands

subject to privatization and exploitation. However, Article 3, Section 2 of the law specifically

exempted the El Paso area from the Colonization law. Additionally, Articles 13, 17, 18, 19 and

20 further protected the communal lands of "ancient communities," i.e. Indian Pueblos from any

potential claims.

35.    In 1825, the state of Chihuahua, Mexico, confirmed the YDSP Indian Pueblo

Spanish land grant. The Mexican alcalde of El Paso, Félix Pasos, surveyed the grant and

confirmed the total area as 17,588 acres.

36.     The Republic of Texas was established on March 2, 1836.  The Texas Republic never exercised sovereignty or governmental authority in the El Paso area.  Mexico and the state of Chihuahua exercised uninterrupted sovereignty and governmental jurisdiction over the El Paso area from Mexican independence in 1821 through American accession in 1848.

37.     In 1841 Mexican authorities considered YDSP a Pueblo Indian community entitled to its communal land base.  In July 1841, the prefect of the El Paso district, José María Elías González, mediated a boundary dispute between YDSP and Senecú Pueblo.  He met with the Indian leaders of both Pueblos, effected a compromise agreeable to both parties, and listed the names and positions of those who witnessed the proceedings.  The documentary record shows the continuation of the traditional Indian Pueblo government and officers including the cacique, governor, and war captain at both Pueblos, and the continuing recognition by Mexican authorities of the Pueblos' status as self-governing, corporate entities holding communal lands. The dispute was not mediated between or among individual private property owners.

38.     The United States annexed Texas as a state on December 29, 1845.

39.     Mexico and the state of Chihuahua continued to exercise sovereign jurisdiction and administrative control over the El Paso area, including YDSP and its Spanish land grant and aboriginal Indian title lands, until the July 4, 1848, effective date of the Treaty of Guadalupe Hidalgo when the United States acceded to sovereignty and jurisdiction.

***The American Period: 1848 – Present.***

40.     The Mexican-American War ended on Feb. 2, 1848, with the signing of the Treaty of Guadalupe Hidalgo. Treaty of Peace, Friendship, Limits and Settlement, U.S.-Mex., 9 Stat. 922.

41.     The 1848 Treaty of Guadalupe Hidalgo transferred sovereignty over territory previously held by Mexico to the United States, including the YDSP Spanish land grant and aboriginal Indian title lands.

42.     The Treaty of Guadalupe Hidalgo specified the international boundary between the United States and Mexico as the middle of the principal stream (thalweg) of the Rio Grande.

43.     Articles VIII and IX of the Treaty of Guadalupe Hidalgo guaranteed protection of property rights and land titles to citizens and former citizens of Mexico within the Mexican Cession, including YDSP.

44.     The Constitution and laws of the United States became applicable and enforceable upon the accession of the United States to sovereignty and jurisdiction over the El Paso area, including the Indian Non-Intercourse Act, 25 U.S.C. §177, which provides in relevant part:

> No purchase, grant, lease, or other conveyance of lands or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

45.     When the Rio Grande flooded in 1849, an avulsion left approximately half of the YDSP and Senecú Pueblo Spanish land grants south of the main channel of the Rio Grande in Mexico, including the Pueblo of Senecú village.  Mexico expropriated the YDSP lands in Mexico for the benefit of Senecú.

46.     On October 4, 1849, United States Indian Agent for New Mexico, James S. Calhoun, sent a list of New Mexico Indian Pueblos to the United States Commissioner of Indian Affairs, Colonel William Medill.  The list included the Pueblos of Ysleta and Socorro downriver from El Paso.

47.    The Compromise of 1850 established the United States Territory of New Mexico and established the boundary between New Mexico Territory and the state of Texas in its present location.

48.    The Compromise of 1850 placed El Paso and Ysleta del Sur Pueblo within the boundaries of El Paso County, Texas.

49.    In 1853, because of YDSP's claim to its remaining Spanish grant lands north of the Rio Grande and litigation by YDSP's upstream neighbor, Senecú Pueblo, the El Paso district surveyor, William L. Diffenderfer, resurveyed the portion of the YDSP grant north of the river. The record of Diffenderfer's survey and his field notes refer to a grant from the King of Spain to YDSP.  The survey confirmed that "one league, 21 labors and 81 acres" (8,148.34) of YDSP Spanish grant area remained north of the international boundary.

C.    **The Subject Property**

50.    YDSP seeks a declaratory judgment confirming that the Pueblo is the beneficial, possessory owner of approximately 111.73 acres of real property particularly described as follows:

a.    A parcel of land located south of the Gateway East Boulevard and Zaragoza Road Intersection containing 31.9029 acres, more or less, identified by the following legal description: a portion of Tracts 10, 11, 12, 13, 14B, 15B and 16, Block 55, Ysleta Grant, City of El Paso, El Paso County, Texas.  A map of said parcel is attached as Exhibit A.

b.    A parcel of land located on the southeast corner of Gateway East Boulevard and Zaragoza Road Intersection containing 9.240 acres, more or less, identified by the following legal description: a portion of Tracts 7A, and 8C, Block 55, Ysleta Grant, City

of El Paso, El Paso County, Texas.  A Plat of Survey and Metes and Bounds description of said parcel is attached as Exhibit B.

     c.     A parcel of land located south of the Gateway East and Zaragoza Road Intersection containing 1.578 acres, more or less, described as a portion of Tracts 9 and 10, Block 55, Ysleta Grant, City of El Paso, El Paso County, Texas.  A Plat of Survey and Metes and Bounds description of said parcel is attached as Exhibit C.

     d.     A parcel of land located at 1100 N. Zaragoza Road containing 69.0 acres more or less, known as Blackie Chesher Park, City of El Paso, El Paso County, Texas.

These parcels are referred to collectively as the "subject Property."

     51.     The subject Property is located in the boundaries of YDSP's aboriginal Indian title area and Spanish land grant area and is part of an area known by the Pueblo as the "Sand Hills."

     52.     YDSP has exclusively used and occupied the area encompassing the subject Property as against all other Indian tribes from no later than 1682 to the present and has established aboriginal Indian title to the subject Property.

     53.     Members of YDSP continue to reside on or near, and to utilize, the Pueblo's aboriginal Indian title and Spanish land grant areas.

     54.     YDSP has very important cultural and spiritual ties to the four claimed parcels. The Abuelos (spirit Grandfathers) travel from that area along the Arroyo de la Verónica to dance at ceremonial dances at the Pueblo.  Pueblo members, accompanied by the Abuelos, go to the Rio Grande to finish the ceremonial calendar, and take the ceremonial objects that were used throughout the year as an offering and as a cleansing of the Pueblo.

55.    The subject Property continues to be used by YDSP tribal members for traditional cultural activities in a ceremonial cycle that begins in early June, continues through early January, and includes religious pilgrimages, subsistence food and plant gathering, La Salida de Los Santos" (The Procession of the Saints), and the Corn Dance.  It is also used for recreational activities.

56.    The subject Property also serves as a sacred passageway to the Pueblo's ceremonial sites and sacred areas.  It is part of a cultural landscape that connects YDSP with sacred sites within and beyond the YDSP Spanish land grant via the drainage of the Arroyo de la Verónica.  This cultural landscape has religious and cultural meaning for YDSP and provides the context for important traditional activities that combine religious, medicinal, and subsistence practices.

57.    Loma Pelona, located immediately northeast of the subject Property, is a very important sacred site used by YDSP for religious ceremonies and cultural practices.

58.    In the 1930s, the Cerco ceremony (community rabbit hunt) took place in an area that includes the subject Property.  One of the purposes of the rabbit hunt is to keep people close to the land, and to teach them the values of the land and people.  Ritual activities are the focus of the first day of the ceremony and the rabbit hunt takes place on the second day.  Although there are still rabbits on the subject Property, the Cerco ceremony is no longer held there because the rabbit population has been so severely reduced by development and loss of habitat that there are not enough rabbits for the communal hunt.  Individuals continued to hunt rabbits in the Sand Hills, including on the subject Property, until about 1967, when a subdivision was built over portions of the hunting area and rabbits became less numerous.  Currently, tribal members must

go 15 to 20 miles east of the Pueblo to undeveloped areas to find enough rabbits for a Cerco ceremony.

59.    YDSP continues to use various sacred sites within the YDSP aboriginal Indian title and Spanish land grant areas (including an area along the Rio Grande used for ceremonies and ritual races where the four groups involved in La Salida de los Santos meet), and including the subject Property, for annual religious and cultural ceremonies.

60.    The Pueblo has built extensive agricultural systems that are still used by the Pueblo today.

61.    The boundaries of the YDSP's Spanish land grant are marked by geological and geographic features which were identified prior to 1704 and have been used repeatedly as survey corners for the grant.  The Pueblo considers these features to be ceremonial sites and sacred areas.

62.    YDSP members believe the subject Property is part of the sacred cultural landscape of the Pueblo.  The Pueblo's sacred cultural landscape is a critical part of the Pueblo's spiritual livelihood and provides for the continuation of the Pueblo's religious and cultural traditions which the Pueblo brought from the Pueblo of Isleta, New Mexico in 1680.

63.    From the 1850s through 1880s, the Texas legislature passed a series of municipal incorporation acts whereby non-Indian Texas municipal corporations sought to fraudulently and illegally usurp, appropriate and privatize YDSP's aboriginal Indian title and communal Spanish grant lands, issue fraudulent and illegal titles to non-Indians under color of state law, and incorporate such lands into a non-Indian Texas municipality named the "Town of Ysleta."  The "Town of Ysleta" was abolished on October 25, 1895, upon a petition to the commissioners' court of El Paso County and no longer exists.

64.     After the 1880s, and up to 1915, non-Indians undertook a series of actions under color of Texas law attempting to perfect their fraudulent and illegitimate titles.

65.     The city of El Paso has unlawfully occupied the subject Property since approximately 1936 pursuant to an unlawful title arising from the fraudulent attempts by non-Indians to privatize YDSP's communal and inalienable aboriginal Indian and Spanish land grant titles.

66.     YDSP has never consented to any conveyance, alienation, or privatization of any part of its aboriginal Indian title and communal Spanish land grant title areas.

67.     As a matter of law, YDSP's possessory right to its aboriginal Indian title and Spanish land grant title areas has never been extinguished by conquest, voluntary cession, voluntary abandonment, preclusion or any express act of the United States Congress purporting to take or extinguish the Pueblo's title.

## FIRST CAUSE OF ACTION

### Federal Common Law Trespass on
### Federally Protected Aboriginal Indian Title and Spanish Land Grant Possessory Rights to Tribal Trust Land

68.     Plaintiff YDSP realleges all of the foregoing allegations and further alleges that the Defendant's wrongful injury to and interference with the subject Property – its federally protected, inalienable, communal aboriginal Indian title and Spanish land grant trust lands began in approximately 1936 and constitutes a continuing trespass for which the Defendant is liable for damages to the Plaintiff under federal statutory and common law.

**Declaratory Relief**

69.     The Plaintiff's claim presents a genuine case or controversy between the Plaintiff and the Defendant, and the Plaintiff requests that this Court adjudicate and declare the rights and obligations of the parties pursuant to 28 U.S.C. 2201, the Declaratory Judgment Act.

**Injunctive Relief**

70.     For approximately 87 years prior to the commencement of this lawsuit, the Defendant has continued wrongfully to occupy the subject Property for its own purposes and to interfere with or prevent the Plaintiff's quiet enjoyment of its Indian trust lands, which are critically important for the Plaintiff's economic, religious and traditional cultural practices.  The Defendant's wrongful and injurious activities continue to cause reasonable and ever-increasing mental and emotional distress, pain, anxiety, inconvenience and annoyance for the Plaintiff and its members.

71.     There is no adequate remedy for the continuing and threatened future injuries which are being inflicted upon the Plaintiff and its tribal members by the Defendant, and the Plaintiff and its tribal members will be irreparably injured unless this Court acts to enjoin the Defendant from any further wrongful and unlawful trespasses against the Plaintiff's subject Property.

**Compensatory Damages**

72.     By reason of the foregoing wrongful and unlawful conduct of the Defendant, the Plaintiff and its tribal members have been wholly or partially deprived of their rightful possession, use and enjoyment of the subject Property beginning in approximately 1936.

73.     The Plaintiff is entitled to compensatory damages against the Defendant measured by, but not limited to, the loss of rental equivalent and / or profits and / or unjust enrichment by

the Defendant's use and occupation of the subject Property, together with prejudgment interest, adjusted for inflation to current dollar value.

## Exemplary Damages

74.     The Defendant has for many years knowingly and intentionally continued to trespass upon the subject Property against YDSP's protest and demand that Defendant vacate the Property and return it to YDSP's exclusive control, and despite YDSP's efforts to negotiate a settlement, with reckless indifference to YDSP's rights, and in known violation of the law and / or grossly and outrageously and / or in reckless disregard for YDSP's known property rights.

75.     The foregoing actions of Defendant constitute "outrageous conduct" entitling YDSP to exemplary damages against Defendant to the extent Defendant is not entitled to immunity from exemplary damages under federal law, in such amount(s) as the trier of fact may properly determine, considering the nature of Defendant's misconduct and other relevant factors according to law.

76.     The reasons for which the federal courts have generally immunized municipalities from liability for exemplary damages are not applicable to the particular wrongful conduct of the Defendant, and the Defendant's conduct constitutes an extreme situation providing compelling reasons for the Court to make an award of exemplary damages under the particular facts and circumstances of this case.

## SECOND CAUSE OF ACTION

### Violation of the Indian Non-Intercourse Act, 25 U.S.C. §177

77.     Plaintiff YDSP realleges all of the foregoing allegations and further alleges that the federal Indian Non-Intercourse Act, 25 U.S.C. §177, is applicable to the Plaintiff's Indian trust possessory interests in the subject Property.  The Indian Non-Intercourse Act prohibits the

conveyance, alienation or privatization of the Plaintiff's aboriginal Indian title and Spanish land grant possessory interests in the subject (Indian trust) Property.

78.    YDSP's aboriginal Indian and Spanish land grant titles to the subject Property were protected from conveyance, alienation, and privatization during the Spanish colonial and Mexican periods, and by United States statutory and common law following the 1848 Mexican Cession.

79.    The Plaintiff is an Indian "tribe" within the meaning of the Non-Intercourse Act, the subject Property is Indian tribal trust land, the United States has never consented to the alienation or privatization of YDSP's aboriginal Indian tribal trust land and Spanish land grant titles and Congress has never extinguished either of these titles in the subject Property, and YDSP's Indian trust land title in the subject Property, established by the Indian Non-Intercourse Act, has never been terminated.

80.    The Defendant has violated 25 U.S.C. §177 by its use and occupation of the subject Property, and its failure to return the Property to the Plaintiff upon the Plaintiff's demand, for which the Defendant is liable to the Plaintiff under 25 U.S.C. §177.  This Court has federal question jurisdiction over this claim pursuant to 28 U.S.C. §§ 1331 and 1362.

**Declaratory Relief**

81.    The Plaintiff realleges paragraph 69, as to declaratory relief against the Defendant City.

**Injunctive Relief**

82.    The Plaintiff realleges paragraphs 70 and 71, as to injunctive relief against the Defendant City.

**Compensatory Damages**

83.    The Plaintiff realleges paragraphs 72 and 73, as to compensatory damages against the Defendant City.

**Exemplary Damages**

84.    The Plaintiff realleges paragraphs 74-76 as to exemplary damages against the Defendant City.

## THIRD CAUSE OF ACTION

**Federal Statutory §1983 Violation by Defendant city of El Paso**

85.    Plaintiff YDSP realleges all the foregoing allegations and further alleges that it is a protected "person" within the meaning of 42 U.S.C. §1983, a federal statute giving rise to claims over which this Court has jurisdiction under 28 U.S.C §§1331 and 1362.

86.    The Defendant City is a potentially liable "person" within the meaning of §1983.

87.    With reference to the wrongful actions of the Defendant hereinabove alleged, the Defendant is a "person" who, under color of Texas state law, has subjected the Plaintiff to the deprivation of rights, privileges or immunities secured to the Plaintiff by the laws of the United States, with the meaning of §1983.

88.    By reasons of said wrongful and unlawful conduct, the Defendant is liable to the Plaintiff, which is an injured party within the meaning of §1983.

**Declaratory Relief**

89.    The Plaintiff realleges paragraph 69, as to declaratory relief against the Defendant City.

**Injunctive Relief**

90.     The Plaintiff realleges paragraphs 70 and 71, as to injunctive relief against the Defendant City.

**Compensatory Damages**

91.     The Plaintiff realleges paragraphs 72 and 73, as to compensatory damages against the Defendant City.

**Exemplary Damages**

92.     The Plaintiff realleges paragraphs 74-76 as to exemplary damages against the Defendant City.

**Statutory Attorneys' Fees**

93.     Insofar as YDSP may prevail on its claims against the Defendant under 42 U.S.C. §1983, YDSP is entitled to recover its reasonable attorneys' fees and other appropriate litigation expenses authorized by 42 U.S.C. § 1988 from the Defendant.

**<u>PRAYER FOR RELIEF</u>**

Wherefore, the Plaintiff asks that the Court grant the following relief against the Defendant:

a)   A declaration of the rights and obligations of the parties pursuant to the federal Declaratory Judgment Act, 28 U.S.C. § 2201, federal common law, the Indian Non-Intercourse Act, and 42 U.S.C. §1983; as requested by the Plaintiff in all causes of action, including a declaratory judgment: 1) confirming that Plaintiff is and has been the rightful holder of a federally-protected beneficial and possessory interest in its Spanish land grant and aboriginal Indian federal trust titles to the subject Property since at least 1682, and 2) that the Defendant has no estate, right, title or interest in or to the subject Property;

b)  Injunctive relief against the Defendant as requested by the Plaintiff in all causes of action enjoining the Defendant from claiming any estate, right, title or interest in or to the subject Property and from interfering with the Plaintiff's quiet enjoyment of the subject Property;

c)  Compensatory damages against the Defendant as requested by the Plaintiff in all causes of action;

d)  Statutory attorneys' fees and other allowable litigation expenses against the Defendant as requested in the Plaintiff's third cause of action;

e)  The costs of suit incurred by the Plaintiff herein, together with such other relief as the Court may deem just and proper;

f)  Exemplary damages as allowed by law; and

g)  All other relief that the Court deems proper.


Dated:  March 31, 2023

/s/ Kelli J. Keegan
Kelli J. Keegan
Tierra Marks
Admitted Western Dist. of Texas
Barnhouse Keegan Solimon & West LLP
7424 4th Street NW
Los Ranchos de Albuquerque, NM 87107
Phone: (505) 842-6123
Fax: (505) 842-6124
Email: kkeegan@indiancountrylaw.com
        tmarks@indiancountrylaw.com

Attorneys for Plaintiff Ysleta Del Sur Pueblo

VERIFICATION

I, E. Michael Silvas, Governor of the Ysleta del Sur Pueblo, state that I have read the foregoing verified complaint and know the contents thereof. The same is true and correct to the best of my knowledge, information and belief, except as to those matters which are therein stated on information and belief, and as to those matters, I believe them to be true.

I declare (or certify) under penalty of perjury that the foregoing is true and correct.


Dated:  March 31, 2023

_____
E. Michael Silvas
Governor
Ysleta del Sur Pueblo